UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

HABIBO A. JAMA,

    Plaintiff,

v.

UNITED STATE OF AMERICA,
CITY OF SEATTLE, *et al.*,

    Defendants.

C09-0256-JCC

**ORDER**

This matter comes before the Court on the motion to dismiss and motion for summary judgment of Defendants Robert Brooks, Michele Hacket and Jennine Smith. (Dkt. No. 34). The Court has considered Defendants' motion, Plaintiff's response (Dkt. No. 45), and Defendants' reply (Dkt. No. 51), as well as the parties' declarations and exhibits. The Court has also considered the supplemental briefing of both parties. (Dkt. Nos. 65, 68 & 70). Having determined that oral argument is unnecessary, the Court hereby GRANTS Defendants' motion and DISMISSES Plaintiff's claims against Defendants Brooks, Hacket and Smith with prejudice.

## I. BACKGROUND

This controversy stems from a July 2006 raid of Plaintiff's residence by federal and local law-enforcement authorities.[1] Officials were searching for evidence relating to the importation and distribution of *khat*, a leafy herb indigenous to the Horn of Africa and the lower Arabian Peninsula, where residents have long chewed the plant's leaves for its stimulative effects. *Khat* itself is legal in the United States, but the plant's stimulative effects come from cathonine and cathine, which are classified as Schedule I and IV drugs, respectively. *Khat* is typically consumed fresh, because the cathinone breaks down into cathine within two to three days after harvesting. When a person ingests cathonine by consuming fresh *khat,* he is therefore violating American drug laws. *See Argaw v. Ashcroft*, 395 F.3d 521, 524–27 (4th Cir. 2005) (discussing *khat*, cathonine, cathine, and American drug laws).

On July 20, 2006, a federal grand jury indicted eighteen individuals for conspiracy to import and distribute *khat*. On July 24, 2006, Defendant Robert Brooks, a special agent with the Drug Enforcement Administration (DEA) submitted a search-warrant affidavit to Magistrate Judge Mary Alice Theiler, recounting details from an investigation that ran from February 2006 to July 2006. In the affidavit, Defendant Brooks avers that eighteen separate individuals in the Seattle area conspired to import *khat* into the United States from Europe. Defendant Brooks explained that conspirators in Europe imported the product using the services of the commercial delivery firm Federal Express ("FedEx"), and that they typically addressed the packages to false names like "John Kerry" and "John Smith." The affidavit also describes the results of a court-authorized wiretap of the ringleader's cellular telephone, stating that the DEA intercepted more than one thousand conversations relating to *khat* importation and distribution during the month between June 15, 2006 and July 14, 2006. (Warrant Affidavit 1–13 (Dkt. No. 40-3 at 34–46)).

---

[1] Because this matter is before the Court on Defendants' motion to dismiss, all facts are taken in the light most favorable to Plaintiff. *See Scheuring v. Traylor Bros., Inc.*, 476 F.3d 781, 784 (9th Cir. 2007).

Defendant Brooks averred in the warrant affidavit that probable cause existed to search seventeen separate locations for evidence ranging from *khat* itself to drug-transaction ledgers to firearms and ammunition. Defendant Brooks also averred that "[t]he conpirators in this case use their telephone constantly[,]" and that "[t]heir phones, including the stored calls, messages, text messages, list of contacts, and in- and out-going numbers may be highly relevant evidence." (*Id.* at 12).

Plaintiff was not a suspect, and was not indicted by the grand jury. Because one of the suspects shared her apartment, however, her residence was among those be searched: Plaintiff's uncle Abdigafar Ali Hassan had picked up one package believed to contain *khat* at a local FedEx facility on May 18, 2006, and a second package on July 13, 2006. The May 18 package was addressed to "John Smith" at an address belonging to Abdulaahi Ahmed, an indicted co-conspirator. Mr. Hassan had provided the FedEx employee with Mr. Ahmed's telephone number, in order to authorize the release of the package. The July 13 package was addressed to an unknown person at an unknown address. To satisfy the probable-cause requirement with respect to Plaintiff's apartment, Defendant Brooks relied on the fact that Mr. Hassan's Washington State driver's license listed Plaintiff's apartment as his home address. The affidavit states that Plaintiff's apartment was "believed to be occupied by Abdigafar HASSAN[,]" and that "[t]he utilities for the residence are registered to Habibo A. Jama [Plaintiff]." (Warrant Affidavit 26–27 (capitalization in original)).[2] (*Id.* at 26–27).

The search was conducted in the early-morning hours of July 26, 2006. Defendant Jennine Smith, a DEA agent, and Defendant Michele Hacket, a City of Seattle police officer assigned to work with the DEA, began to surveil Plaintiff's home at 4 a.m. for a search that police had scheduled to occur at 6 a.m. At 5:42 a.m., just before officers were about to enter the apartment, Defendants Hacket and Smith observed a car briefly pull up outside Plaintiff's apartment complex. They saw a man later

---

[2] By writing Mr. Hassan's last name in all capital letters, Defendant Brooks communicated to the magistrate judge that Mr. Hassan had been indicted by the grand jury. By writing Plaintiff's name using lower-case letters, he communicated that Plaintiff had *not* been indicted. (*See* Warrant Affidavit at 2 ("Charged defendants are noted in this affidavit by their capitalized names . . . .").

identified as Farah Jama get out of the passenger-side front door and enter Plaintiff's apartment. Officers waited until the Mr. Jama had entered, and then resumed preparations for the raid, lining up outside the building to execute the warrant. Just before officers announced their presence, Defendants Hacket and Smith saw Plaintiff look outside from her bedroom window, and then quickly retreat inside. Farah Jama then did the same. Defendants Hacket and Smith concluded that Plaintiff and Mr. Jama had seen the officers, which they immediately communicated to the officers using police radios. (DEA Report 1–2 (Dkt. No. 40-3 at 107–108)).

Plaintiff was in her bedroom when police entered her home. She "heard a crash and they barged into my home." (Jama Decl. 1 (Dkt. No. 43)). Dressed in a night gown without a bra or underwear beneath, she walked out of her bedroom, and saw men in black running up the stairs toward her with their guns drawn. Plaintiff states that she "did not hear the people say they were police officers or why they were there." (*Id.* at 1). Officers forced her to the ground and tied her hands behind her back. At some point, it was made clear to Plaintiff that her home had been entered by law-enforcement officers. (*Id.* at 1–3).

Officers detained a total of five individuals, including Plaintiff, while they searched Plaintiff's apartment for evidence relating to *khat* distribution. The other four detained individuals were men, and two of them were not members of Plaintiff's family. This caused Plaintiff distress because her Muslim faith prohibits her from appearing in a state of undress or from appearing without a head scarf before unrelated males. Plaintiff is not a fluent English speaker, so she asked her uncle Mr. Hassan, who was also detained, to request a cover for her hair and body from police officers. Defendant Smith refused Plaintiff's requests for modest clothing, and photographed her in the nightgown and without a head scarf. After taking the photographs, Defendant Smith placed a loose piece of cloth over Plaintiff's head. Approximately one hour after the officers entered Plaintiff's apartment, they moved the detainees outside. Plaintiff was still wearing nothing more than her nightgown. Because Defendant Smith had

failed to secure the piece of cloth, it fell off Plaintiff's head as she was walking outside. Plaintiff, whose hands were still tied behind her back, was unable to grab the cloth and cover herself. (*Id.* at 1–3).

Officers instructed Plaintiff and the male detainees to move outside and sit on the ground, from which position they were visible to neighbors. Mr. Hassan again explained to police officers that Plaintiff's religion forbade her from appearing uncovered before unrelated men, and asked that she be allowed to remain inside the apartment, or at least behind the building, where she would not be visible to neighbors. Officers refused the request. Plaintiff remained outside for several hours, uncovered except for the night gown, while officers searched her apartment for evidence relating to *khat*. They found none. (*Id.* at 1–3). Officers nonetheless seized $5700 in U.S. currency belonging to Plaintiff that they discovered in a locked suitcase. Plaintiff, who had earned the money as a maid at a local hotel, was unable to secure the return of the money until February 2007. Police also seized some of Plaintiff's jewelry, which the Government has so far failed to return. Defendant Brooks played no role in the search of Plaintiff's apartment other than preparing the warrant affidavit. (DEA Report 1–8 (Dkt. No. 40-3 at 107–114)).

Defendants Brooks, Hackett, and Smith filed a motion to dismiss and motion for summary judgment in July 2009, while this matter was pending before the Honorable Ricardo S. Martinez. (Dkt. No. 34). Plaintiff opposed the motion, and requested leave to amend her complaint. (Dkt. No. 45). Judge Martinez granted Plaintiff's motion for leave to amend in September 2009, and ordered the parties to submit supplemental briefing in light of Plaintiff's amended complaint. (Dkt. No. 60). Plaintiff promptly submitted a second amended complaint (Dkt. No. 61), and the parties each submitted supplemental briefs shortly thereafter. (Dkt. Nos. 65, 68 & 70). Judge Martinez transferred this matter to this Court in December 2009, with Defendants' motion to dismiss and motion for summary judgment still pending. (Dkt. No. 73). As the matter comes before this Court, Plaintiff alleges that

Defendant Brooks violated Fourth Amendment right to be free from unreasonable searches and seizures, and that Defendants Hacket and Smith substantially burdened Plaintiff's right to freely exercise her religion, thereby violating the Religious Freedom Restoration Act. Defendants argue that they are entitled to summary judgment under the theory of qualified immunity with respect to all claims.

## II. SUMMARY JUDGMENT & QUALIFIED IMMUNITY

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A defendant may move for summary judgment by alleging that the plaintiff, who bears the burden of proof at trial, cannot "make a showing sufficient to establish the existence of an element essential to [the plaintiff's] case, and on which [the plaintiff] will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the defendant so alleges in a motion for summary judgment, a burden shift occurs, and it becomes the plaintiff's obligation "to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotations omitted).

When determining whether to grant a party's motion for summary judgment, this Court views all facts in the light most favorable to the non-moving party and makes all inferences in her favor. *See Scheuring v. Traylor Bros., Inc.*, 476 F.3d 781, 784 (9th Cir. 2007). The Court may not accept unsupported assertions in a complaint as facts, however, as this could unnecessarily delay the prompt disposal of meritless claims: "[T]he purpose of Rule 56 is to enable a party who believes there is no genuine dispute as to a specific fact essential to the other side's case to demand at least one sworn averment of that fact before the lengthy process of litigation continues." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888–89 (1990).

**A.     Qualified Immunity**

When a plaintiff alleges that a federal official has violated his or her constitutional rights while acting under the color of law, a private right of action arises directly from the U.S. Constitution. *See Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971). Because the underlying claim requires a balance of two competing public interests—on the one hand, holding public officials accountable when they exercise power in an unconstitutional manner, and on the other hand, protecting public officials from harassment and distraction when they perform their functions reasonably—courts have created a qualified-immunity defense to constitutional claims against public officials: "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, --- U.S. ---, ---, 129 S.Ct. 808, 815 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

When a public official claims qualified immunity, this Court generally conducts a two-step analysis. *See Pearson*, 129 S.Ct. at 818 (describing what was formerly a mandatory two-step analysis as a "beneficial" means of resolving motions for qualified immunity). First, the Court asks whether the plaintiff has alleged the violation of a constitutional or statutory right. If the plaintiff has failed to allege the deprivation of a constitutional or statutory right, the analysis is at an end, and the public official enjoys qualified immunity. If the plaintiff successfully alleged the deprivation of his or her constitutional or statutory rights, the analysis continues to a second question: whether the right was "clearly established" at the time of the public official's alleged misconduct. *Id*. at 815–16. If the right was not clearly established at the time of the alleged violation, the public official enjoys qualified immunity. In short, the public official is potentially liable only if the plaintiff has successfully alleged that the official violated her constitutional or statutory rights, and has demonstrated that the rights of which she was deprived were clearly established at the time of the violation. *Id.* at 816.

## III. DISCUSSION

Defendant Brooks argues that he is entitled to qualified immunity because Plaintiff has failed to allege that he violated any of her rights when he prepared the warrant affidavit and submitted it to the magistrate judge.[3] (Dkt. No. 65 at 3–8). Defendants Hacket and Smith argue that they are entitled to qualified immunity for the same reason—Plaintiff has failed to allege that they violated her rights under the Religious Freedom Restoration Act. Defendants Hacket and Smith also forward an alternative theory, arguing that even if they violated Plaintiff's statutory rights, those rights were not clearly established at the time of the search. (*Id.* at 8–11).

### A. Defendant Brooks

Plaintiff forwards two theories of liability against Defendant. First, she argues that the warrant affidavit failed to state probable cause, and that the failure was so manifest that Defendant Brooks was unreasonable to rely on the magistrate judge's issuance of the warrant. (Dkt. No. 68 at 4–7). In the alternative, Plaintiff argues that even if the warrant affidavit stated probable cause, it succeeded in doing so only because Defendant Brooks deliberately or recklessly omitted material facts. (*Id.* at 7–8). For the reasons explained below, the Court rejects both arguments, and thereby grants the motion of Defendant Brooks for summary judgment.

#### i. Alleged Failure to State Probable Cause

A public officer enjoys qualified immunity if he or she prepares a warrant application that the magistrate judge approves, unless "the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable." *Malley v. Briggs*, 475 U.S. 335, 344–45 (1986);

---

[3]Defendant Brooks also moves to dismiss based on the relevant statute of limitations. Plaintiff did not identify a constitutional defect in the preparation of the warrant affidavit until her second amended complaint, which she filed more than three years after he prepared the affidavit. Defendant Brooks therefore argues that Plaintiff's claims against him are time-barred as a matter of law. (Dkt. No. 65 at 2–4); *see also Johnston v. Horne*, 875 F.2d 1415, 1424 (9th Cir. 1989) (holding that Washington State's three-year statute of limitations governs *Bivens* claims).

Because the Court concludes that Defendant Brooks is entitled to qualified immunity and therefore dismisses Plaintiff's claims against him with prejudice, it need not reach the statute-of-limitations issue.

*see also KRL v. Estate of Moore*, 512 F.3d 1184, 1190 (9th Cir. 2008) ("[A]n officer who prepares or executes a warrant lacking probable cause is entitled to qualified immunity *unless no officer of reasonable competence would have requested the warrant.*" (emphasis added)). In other words, the public officer enjoys qualified immunity even if the warrant application fails to state probable cause, so long as the failure would not have been obvious to a reasonable officer. *Pytlik v. Professional Resources, Ltd.*, 887 F.2d 1366, 1371 (9th Cir. 1989). As the Ninth Circuit has stated, the officer enjoys this qualified immunity because he is entitled to rely on the conclusion of the independent magistrate judge. *Pytlik*, 887 F.2d at 1371("[I]nadequate probable cause does not necessarily render a warrant facially invalid nor prevent reasonable belief in the existence of probable cause. . . . [G]enerally, an officer cannot be expected to question the magistrate's probable-cause determination.").

This Court finds that the warrant affidavit successfully alleged probable cause, and that Defendant Brooks was therefore reasonable in submitting it to Magistrate Judge Theiler and relying on her decision to issue the warrant. Plaintiff's uncle Abdigafar Ali Hassan comported himself in such a way that officers reasonably concluded he was part of the alleged conspiracy to import *khat*. He twice picked up packages from police that police suspected to contain *khat*, one of which was addressed to "John Smith" and that listed the address of an indicted co-conspirator. Mr. Hassan also supplied the phone number of the same indicted co-conspirator to authorize the release of the package. Such behavior was consistent with the alleged underlying conspiracy—using FedEx to import packages of *khat*, sending those packages to addresses with fictitious names, and having another person pick them up in person at the delivery facility. Finally, because Mr. Hassan listed Plaintiff's apartment as his address on his driver's license, it was reasonable to conclude that Mr. Hassan lived there. Furthermore, it was reasonable to conclude that as a participant of the alleged conspiracy, Mr. Hassan maintained *khat* and evidence relating to *khat* distribution in the apartment.

Plaintiff devotes substantial time to arguing that Defendant Brooks was objectively unreasonable to submit the warrant affidavit because too much time had passed since investigating officers had observed Mr. Hassan participate in the conspiracy and the date of the search. Plaintiff notes that the cathonine in *khat* dissipates approximately three days after the plant is harvested, and that more than two months separated May 13, 2006, the date when Mr. Hassan first picked up a suspected package, and July 26, 2006, the date of the search. Plaintiff's argument fails for several reasons. First, Mr. Hassan also picked up a suspected package on July 13, 2006. Investigators therefore had probable cause to believe that he was part of an ongoing criminal conspiracy, and that he was involved in the constant and ongoing importation and distribution of *khat*. Second, the value of fresh *khat* is higher than the value of stale *khat*, precisely because the stimulative effects of the former are so greater. Investigators were therefore reasonable in concluding that importers and distributors would constantly maintain a fresh supply on hand for sale. Finally, old *khat* would also be evidence of drug violations, a person with old *khat* in his possession on the date of a particular police search is likely to have previously possessed fresh *khat*.

### ii. Material Omissions

A public officer who prepares a warrant application that includes some materially false information or that omits material information enjoys qualified immunity unless the officer deliberately or recklessly offered the false information or omitted the material information. *See Hervey v. Estes*, 65 F.3d 784, 788 (9th Cir. 1995); *Branch v. Tunnell*, 937 F.2d 1382, 1387 (9th Cir. 1991) ("[I]f an officer submitted an affidavit that contained statements he knew to be false or would have known were false had he not recklessly disregarded the truth[,] . . . he cannot be said to have acted in an objectively reasonable manner, and the shield of qualified immunity is lost."). A civil-rights plaintiff alleging that an officer violated her Fourth Amendment rights in preparing and submitting a warrant application therefore bears the burden at the summary judgment stage of submitting some quantum of evidence tending to show

reckless or deliberate disregard for the truth. *See Liston v. County of Riverside*, 120 F.3d 965, 973 (9th Cir. 1997).

The plaintiff also bears the burden of "mak[ing] a substantial showing of deliberate falsehood or reckless disregard for truth and establish that, but for the dishonesty, the challenged action would not have occurred." *Hervey*, 65 F.3d at 789. A plaintiff does not satisfy this burden simply by pointing to false statements or omitted information: She "must establish both a substantial showing of the deliberate falsity or reckless disregard of the statements, *and the materiality of those statements to the judge's ultimate determination of probable cause.*" *Id.* (emphasis added).

Plaintiff alleges that Defendant Brooks deliberately omitted the following facts, which she argues are material: first, Mr. Hassan maintained a second residence, different from Plaintiff's apartment; second, police had never detected Mr. Hassan making or receiving any phone calls during the one month of police telephone surveillance; and third, police had no direct evidence tending to show that Mr. Hassan maintained a firearm in Plaintiff's apartment. To argue that these omissions were deliberate, Plaintiff points to a statement Defendant Brooks made in the affidavit itself: "I have not included every fact known to law enforcement concerning the investigation. I have set forth only the facts that I believe are essential to establish probable cause to search the locations listed." (Dkt. No. 68 at 7–8 (citing Affidavit 1 (Dkt. No. 40)).

Plaintiff's arguments fail on multiple levels. First, Plaintiff cannot demonstrate the materiality of the omissions: The warrant to search Plaintiff's apartment would have likely issued even if Defendant Brooks had included the omitted information. Mr. Hassan picked up packages suspected to contain contraband on two occasions, and he provided the telephone number of a co-conspirator in order to authorize the release of one package. This was sufficient information to implicate him in wrong-doing. That his name was not used during any surveilled telephone call is immaterial—the magistrate judge would have nonetheless found probable cause to believe he was a participant in the conspiracy to import

and distribute *khat.* Having reached that conclusion, the magistrate judge would have authorized police to search his residence, and it is undisputed that Mr. Hassan maintained a residence at Plaintiff's apartment and that he listed her apartment on his Washington State driver's license as his primary residence. If the magistrate judge had known that Mr. Hassan maintained two residences, she would have authorized police to search both of them. Finally, Defendant Brooks was entitled to rely on his training with the DEA to conclude that Mr. Hassan was likely to maintain a firearm near the contraband *khat*. Because dealers of contraband are unable to rely on police to protect their investment, they often resort to defending their contraband property themselves, and often use firearms to do so.

Plaintiff's argument also fails to offer any evidence tending to show that the omissions represented a reckless or deliberate disregard for the truth. The averment of Defendant Brooks that he was "set[ting] forth only the facts that I believe are essential to establish probable cause to search the locations listed," is boilerplate language typical of warrant applications. It signaled to the reviewing magistrate that Defendant Brooks was not transcribing every detail of a months-long investigation into *khat* distribution; he was only setting forth those facts necessary to support probable cause to search particular places in the District of Western Washington. Plaintiff attempts to distort the meaning of the statement when she attempts to use it to demonstrate intentional or reckless disregard for the truth. The attempt fails.

For the aforementioned reasons, the motion for summary judgment of Defendant Brooks is granted. The Court hereby dismisses all claims against Defendant Robert Brooks with prejudice.

**B.     Defendants Hacket & Smith**

The parties dispute whether qualified immunity is available to public officials whom plaintiffs allege to have violated their rights under the Religious Freedom Restoration Act (RFRA). Plaintiff points out that the Ninth Circuit expressly left the question unanswered in *Kwai Fun Wong v. United States*, 373 F.3d 952, 977 (9th Cir. 2004) (declining to reach the issue of whether "qualified immunity is available to

a federal government official sued under RFRA."). The Court first concludes that qualified immunity is available under RFRA, and then turns to the merits of Defendants' qualified-immunity claim.

i. **Qualified Immunity & the Religious Freedom Restoration Act**

This Court follows the emerging trend of legal authority in holding that Defendants Hacket and Smith are entitled to assert qualified immunity. *See Rasul v. Myers*, 563 F.3d 527, 533 n.6 (D.C. Cir. 2009) ("[D]efendants are entitled to qualified immunity against the plaintiffs' RFRA claim."); *Keen v. Noble*, 2007 WL 2789561, at *9 (E.D. Cal. 2007) ("Plaintiff's RFRA claim . . . is dismissed because the defendants are entitled to qualified immunity"); *Wong v. Beebe*, 2007 WL 1170621 (D. Or. 2007) ("[Defendant] is entitled to summary judgment on the [RFRA claim] . . . ."). Plaintiff argues that this authority is inapposite because the plaintiffs in the cited cases failed to argue that qualified immunity was unavailable. Plaintiff argues that the deciding courts therefore assumed, without deciding, that qualified immunity was available. According to Plaintiff, this means that "the question is unresolved[.]" (Dkt. No. 68 at 11).

Assuming *arguendo* that the issue of qualified immunity in the context of a claim under the Religious Freedom Restoration Act comes before this Court as a matter of first impression, Plaintiff's argument still fails. The same competing public interests—on the one hand, holding public officials accountable when they exercise power in an illegal manner, and on the other hand, protecting public officials from harassment and distraction when they perform their functions reasonably—apply to RFRA claims as to *Bivens* claims and claims under the Civil Rights Act. Moreover, the seminal language from the Supreme Court suggests that the defense is equally available against claims arising from the Constitution and against those claims arising from statute. *See Pearson v. Callahan*, --- U.S. ---, ---, 129 S.Ct. 808, 815 (2009) ("The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established *statutory or constitutional* rights of which a reasonable person would have known." (emphasis added) (quoting

1  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

2  //

      **i.**      **Discussion**

The Religious Freedom Restoration Act provides that "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability[.]" 42 U.S.C. § 2000bb-1(a). The Act creates an exception, however, allowing the Government to "substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person (1) is in the furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." *Id.* § 2000bb-1(b).

Plaintiff argues that Defendants Hacket and Smith violated her rights under the Act by refusing her requests for a headscarf and for clothing that was more modest than her nightgown, and by forcing her to remain in her relative state of undress in the presence of unrelated males. (Dkt. No. 61 at 12–13). Plaintiff argues that these refusals represent a substantial burden of her statutory rights because her Muslim beliefs require that she dress more modestly in the presence of unrelated males. (Dkt. No. 68 at 11–12). According to Plaintiff, no compelling governmental interest justified the burden once all the suspects inside her apartment had been detained and the apartment itself secured. As Plaintiff argues, "[She] and her family repeatedly informed Defendant Hacket, Defendant Smith, and the other officers of the religious importance of proper clothing and a head scarf, *after her apartment and all persons inside had been secured.*" (Dkt. No. 68 at 12) (emphasis in original).

Defendants focus most of their attention on whether Plaintiff's allegations constitute the deprivation of a statutory right that was clearly established at the time of the search. As Defendants state, "Plaintiff has not pointed to even one case in which a court has applied RFRA to a situation in which an individual was detained by law enforcement and, during the detention, was prevented by law enforcement from engaging in the free exercise of his or her religion." (Dkt. No. 65 at 10). Plaintiff

disagrees with Defendants' characterization of the relevant case law, citing *Hall v. Griego*, 896 F. Supp. 1043 (D. Colo. 1995), and *Luckette v. Lewis*, 883 F. Supp. 471 (D. Ariz. 1995). In each case, prison guards prohibited prisoners from wearing certain headcoverings that the prisoners claimed their religious beliefs required them to wear. In *Hall*, the trial judge denied the federal defendants' motion for summary judgment. *Hall*, 896 F. Supp. at 1048. In *Luckette*, the trial judge ordered prison officials to "meet with the plaintiff and . . . agree on an appropriate headcovering which will not present safety concerns," but left open the possibility that prison-safety requirements might preclude the plaintiff "from wearing . . . duly designated dangerous headcoverings." *Luckette*, 883 F. Supp. at 483–84.

Those cases are clearly distinguishable from this case, however. Both dealt with long-term deprivations of a person's religious practices in a place of long-term custody. In a prison setting, public officials have the responsibility of creating and maintaining procedures and facilities that allow prisoners to exercise their religious beliefs. No such obligation exists while police are performing searches and making arrests. In both of the cases that Plaintiff cites, prison officials prohibited prisoners from wearing their headcoverings throughout the day, while eating meals, enjoying air with other prisoners, and generally passing time. In Plaintiff's case, she was only prohibited from wearing her head scarf for approximately four hours, while officers performed a search of her apartment.

In short, the cases are sufficiently distinguishable that this Court must grant the motion for summary judgment of Defendants Hacket and Smith. The Court cannot say that the purported right of a person to wear religious covering during a search of a her home was "clearly established" at the time of the search. *See Pearson*, 129 S.Ct. at 815–16. The Court therefore declines to reach the issue of whether Plaintiff has alleged the violation of a constitutional or statutory right. *See id.* at 818 (holding that a trial court can properly refuse to consider whether a plaintiff has alleged the violation of a plaintiff's constitutional or statutory rights if the court concludes that those rights were not clearly established at the time of the alleged deprivation).

The Court therefore grants the motion of Defendants Hacket and Smith for summary judgment, and dismisses all claims against them.

## IV. CONCLUSION

For the aforementioned reasons, the Court hereby GRANTS Defendants' motion. The Court DISMISSES Plaintiff's claims against Defendants Robert Brooks, Michele Hacket and Jennine Smith. Plaintiff's claims against other defendants are unaffected by this order.

SO ORDERED this 2nd day of March, 2010.

JOHN C. COUGHENOUR
United States District Judge