1

Honorable John C. Coughenour

2

3

4

5

6

7

8

9      UNITED STATES DISTRICT COURT
       WESTERN DISTRICT OF WASHINGTON
                AT SEATTLE

10

11

12  HABIBO A. JAMA,

13              Plaintiff,

                                        C09-0256-JCC
14        v.
                                        **ORDER**
15  UNITED STATES OF AMERICA,
    CITY OF SEATTLE, CITY OF TUKWILA,
16  TODD HARRIS, MATT NESS, *et al.*,

17              Defendants.

18

19      This matter comes before the Court on four separate motions for summary judgment (Dkt. Nos.

20  77, 86, 91 & 96), and on a motion for reconsideration. (Dkt. No. 84). First, the Court has before it the

21  motion for summary judgment of Defendant City of Tukwila. (Dkt. No. 77). Plaintiff has filed a response

22  to the motion (Dkt. No. 80), and the City of Tukwila has filed a reply. (Dkt. No. 83). Second, Defendant

23  United States Government has filed its own motion for summary judgment (Dkt. No. 86).  Plaintiff has

24  filed a response to the motion (Dkt. No. 105), and the United States has filed a reply. (Dkt. No. 111).

25

26  ORDER, C09-0256-JCC
    Page 1

Third and fourth, the Court has before it the motion for summary judgment of Defendant City of Seattle and Seattle police officers Todd Harris, Matt Ness, Joe Pioli, and Steve Wilske (Dkt. No. 91), and Plaintiff's cross-motion for partial summary judgment (Dkt. No. 96). Plaintiff has filed a response to the City of Seattle's motion for summary judgment (Dkt. No. 108), and the City of Seattle has filed a reply. (Dkt. No. 115). The City of Seattle has filed a response to Plaintiff's cross-motion for partial summary judgment (Dkt. No. 107), and Plaintiff has filed a reply. (Dkt. No. 112). Finally, the Court has considered Plaintiff's motion for reconsideration. (Dkt. No. 84).

Having reviewed the pleadings, along with the parties' various exhibits and declarations, the Court finds that oral argument is unnecessary. For the reasons explained below, the Court hereby DENIES the motion for summary judgment of Defendant City of Tukwila (Dkt. No. 77), and GRANTS in part and DENIES in part the motion for summary judgment of Defendant United States Government. (Dkt. No. 86). The Court hereby GRANTS the motion for summary judgment of Defendant City of Seattle and the four named officers (Dkt. No. 91), and DENIES Plaintiff's cross-motion for summary judgment against the same defendants. (Dkt. No. 96). Finally, the Court STRIKES Plaintiff's motion for reconsideration. (Dkt. No. 84).

## I.    BACKGROUND

This controversy stems from a July 2006 raid of Plaintiff's apartment by federal and local law-enforcement authorities who were looking for evidence relating to *khat* distribution.[1] *Khat* is a leafy herb indigenous to the Horn of Africa and the lower Arabian Peninsula, where residents have long chewed the plant's leaves for its stimulative effects. Congress has never passed a law banning *khat*. The plant became illegal, however, in 1993, when the Attorney General listed cathinone as a Schedule I drug. Under the

---

[1]Because this matter is before the Court on Defendants' motion for summary judgment, all facts are taken in the light most favorable to Plaintiff. *See Scheuring v. Traylor Bros., Inc.*, 476 F.3d 781, 784 (9th Cir. 2007).

Controlled Substances Act of 1970, *codified at* 21 U.S.C. § 801 *et seq.*, the Attorney General has the authority to list "any drug or or other substance" as a Schedule I drug, "if he finds with respect to such drug or other substance"  that "[it] has a high potential for abuse," that it "has no currently accepted medical use in treatment in the United States," and that "[t]here is a lack of accepted safety for use of the drug or other substance under medical supervision." 21 U.S.C. §§ 811–12. In 1993, the Attorney General made such findings with respect to cathinone, and published the findings in the Federal Register. 58 Fed. Reg. 4316 (1993). In the same order of the Federal Register, the Attorney General found that *khat* contains cathinone. *Id.* 4317 ("Cathinone is the major psychoactive component of the plant *catha edulis* (*khat*). . . . When *khat* contains cathinone, *khat* is a Schedule I substance."). When the Attorney General published such findings in the Federal Register, *khat* became a contraband substance in the United States. *See also Argaw v. Ashcroft*, 395 F.3d 521, 524–27 (4th Cir. 2005) (discussing *khat*, cathinone, and American drug laws).

The July 2006 raid of Plaintiff's apartment came after a months-long Drug Enforcement Administration (DEA) investigation that had started in New York State. The New York State investigation had yielded substantial results, including "the seizure of over 10,000 pounds of *khat*, arrests of individuals involved in importing *khat*, and the identification of distribution cells in the United States." (Warrant Affidavit 2–3 (Dkt. No. 40-3 at 35–36)). In February 2006, DEA agents stationed in New York State informed their Seattle counterparts that one such distribution cell was located in western Washington State. Seattle DEA agents launched an investigation that included a judicially authorized wire tap of the cellular telephone number of the Seattle area's ringleader. The wire tap lasted for one month, from June 15, 2006 to July 14, 2006. During that month, agents intercepted more than one thousand conversations relating to *khat* importation and distribution. (*Id.* 1–13 (Dkt. No. 40-3 at 34–46)). As agents discovered during their surveillance, "The conspirators in this case use their cellular telephones constantly." (*Id.* 12 (Dkt. No. 40-3 at 45)).

On July 20, 2006, a federal grand jury in the Western District of Washington indicted eighteen individuals for conspiracy to import and distribute *khat*. On July 24, 2006, United States Magistrate Judge Mary Alice Theiler authorized the search of seventeen separate locations for *khat*-related evidence—including the plant itself, as well as paraphernalia, financial records, and firearms.[2] Plaintiff was not a suspect, and she was not indicted by the grand jury. Plaintiff's uncle Abdigafar Ali Hassan was a suspect, however, and he was indicted. Because Mr. Hassan had listed the address of Plaintiff's apartment as his residence on his Washington State drivers license, her apartment was among the locations to be searched. (*Id.* 26–27 (Dkt. No. 40-3 at 59–60)).

Seattle DEA officials decided to search all seventeen locations simultaneously, at 6 a.m. on July 26, 2006. DEA officials in the eastern part of the United States coordinated with their Seattle counterparts, also searching for evidence relating to *khat* distribution at six o'clock on the same morning. Officials on the east coast began their searches at 6 a.m. eastern time, however, a full three hours before the Seattle searches began. (Allen Decl. 4 (Dkt. No. 92)). In order to search so many locations simultaneously, the Seattle DEA enlisted the aid of local law-enforcement agencies. The DEA enlisted the aid of the Seattle Police Department's Special Weapons and Tactics (SWAT) team to help with the entry of Plaintiff's apartment, and the Tukwila Police Department to help with the search. (Brooks Decl. 1–2 (Dkt. No. 35)). Officers aver that they were concerned that an occupant at one of the seventeen locations might somehow learn of the impending raid on his or her own residence, and then alert co-conspirators at other residences. (*See, e.g.,* Modesitt Dep. 137–38 (Dkt. No. 93-2 at 8–9) ("[T]hey lived in such . . . tight-knit communities. Any one of their neighbors would have called everyone.")).

//

---

[2] The Court discussed the warrant application at length in its order granting summary judgment to the federal agents. (Order 2–3, 8–12 (Dkt. No. 82)). The Court declines to do so here.

DEA agents Jennine Smith and Michele Hackett began to surveil Plaintiff's apartment at 4 a.m., two hours before the search was scheduled to occur.[3] At 5:42 a.m., officers observed a car pull up outside Plaintiff's apartment complex. A man later identified as Farah Jama got out of the passenger-side front door and entered Plaintiff's apartment.[4] He remained inside while officers resumed preparations for the raid, including lining up outside the building to execute the warrant. At 6:03 a.m., SWAT team members knocked on the door and announced their presence. As they did, Agents Smith and Hackett saw Plaintiff look outside from her bedroom window, and then quickly retreat inside. They then saw Mr. Jama do the same. Agent Hackett concluded that Plaintiff and Mr. Jama had observed the law-enforcement officers outside. As she stated in her deposition testimony:

> I've done hundreds of warrants. I've seen — I've seen this a lot, where you get that — I don't want to use bad language, but that basically, oh, crap, you know, the police are coming, you know, and they see and, you know, it's like that — now, all of a sudden, that quick movement away, you know, like it's hurry up and do something, you know, whatever it is, whether it's flush dope down the toilet, whether it's, you know, get rid of evidence, whether it's hide, whether it's fly out the back door and try to run off before the team comes in, whatever it is. — It's that, you know, uh-oh response, that quick look away.

(Hackett Dep. 36–37 (Dkt. No. 93-2 at 16–17)). Using a radio, Agent Hackett quickly communicated to the SWAT team members lined up outside Plaintiff's door that they had been seen by individuals inside the apartment. (*Id.*).

It is unclear whether Officer Hackett's radio alert in fact triggered the officers' entry. The protocols of the Seattle Police Department's SWAT team called for the officers to wait approximately eight to ten seconds after knocking and announcing their presence. Under the protocols, if police have

---

[3]Ms. Hackett is employed by the Seattle Police Department, but she has been deputized as a task force officer with the DEA since March 2006. She was working as an agent of the DEA on July 26, 2006. (*See* Hackett Decl. 1 (Dkt. No. 36)).

[4]Mr. Jama is Plaintiff's cousin. (Jama Decl. 2 (Dkt. No. 43)).

not heard a response within eight to ten seconds, they generally breach the door and enter without permission. Matthew Allen, the sergeant in charge of the SWAT team that morning, states that an officer "announced [police] presence in a very loud, clear manner[,]" by stating, "Seattle Police with a search warrant. Open the door." Officers waited "approximately eight to ten seconds," after which time Sergeant Allen ordered them to breach the door. (Allen Decl. 4–5 (Dkt. No. 92)). Sergeant Allen states that he does not remember receiving a radio call from the surveilling agents telling him that the entry had been compromised. He states in his own deposition testimony: "[A]s I recall it, the breach was off my timing, not off of a compromise. That's how I remember." (Allen Dep. 84 (Dkt. No. 97-2 at 58)).

Plaintiff was in her bedroom when members of the SWAT team entered her apartment. She "heard a crash and they barged into [her] home." (Jama Decl. 1 (Dkt. No. 43)). Plaintiff walked out of her bedroom and started down the stairs, where she was confronted by "many men in black running up the stairs toward [her] with guns drawn." (*Id.*). While descending, she was forced to the ground by Defendant Todd Harris, a member of the SWAT team. (Second Am. Compl. 7 (Dkt. No. 61)). While she was still on the ground, officers tied her hands together behind her back with plastic flex-cuffs. (Jama Decl. 2 (Dkt. No. 43)). Plaintiff told officers that she was suffering pain in her shoulder, and medics with the Seattle Fire Department were summoned. The medics stayed only a short time, examined Plaintiff, and did not treat her for injuries. (Second Am. Compl. 7 (Dkt. No. 61)). SWAT team members detained the apartment's other four occupants using substantially similar methods. In short, SWAT team members swept and secured the apartment: They moved through each room with guns drawn, detained the several occupants and searched them for weapons, and finally, handcuffed them and placed them all in the living room. (Allen Decl. 5 (Dkt. No. 92)). SWAT team members left at approximately 6:15 a.m., handing the secure apartment and detained occupants over to agents with the DEA and the Tukwila Police Department, who performed the actual search. (*Id.* 5).

While officers were searching her apartment, Plaintiff was wearing a nightgown, without a bra or underwear underneath. The other four detained individuals were men, two of whom were unrelated to Plaintiff. This distressed her, because her Muslim faith prohibits her from appearing in a relative state of undress or from appearing without a head scarf before unrelated males. Plaintiff is not a fluent English speaker, so she asked her uncle Mr. Hassan, who was also detained, to request a cover for her hair and body from police officers. DEA Agent Smith refused Plaintiff's requests for modest clothing, and photographed her in the nightgown and without a head scarf. After taking the photographs, Agent Smith placed a loose piece of cloth over Plaintiff's head. (Jama Decl. 1–3 (Dkt. No. 43)).

Approximately one hour after the officers entered Plaintiff's apartment, they moved the detainees outside. Plaintiff was still wearing nothing more than her nightgown. Because Agent Smith had failed to secure the piece of cloth, it fell off Plaintiff's head as she was walking outside. Plaintiff, whose hands were still tied behind her back, was unable to grab the cloth and cover herself. (*Id.* at 1–3). Officers forced Plaintiff and the male detainees to move outside and sit on the ground, from which position they were visible to neighbors. Mr. Hassan again explained to police officers that Plaintiff's religion forbade her from appearing uncovered before unrelated men, and asked that she be allowed to remain inside the apartment, or at least behind the building, from which locations neighbors would be unable to see her. Officers refused the request, thereby forcing Plaintiff to appear in a state of relative undress before unrelated males. (*Id.* 1–3).

Ron Corrigan, a detective with the Tukwila Police Department who has not been named a defendant in this matter, searched Plaintiff's bedroom. He opened a locked suitcase that he found inside Plaintiff's closet, and discovered $5700 in cash and several miscellaneous documents. Officers seized the cash as potential proceeds from *khat* distribution. (Corrigan Memo (Dkt. No. 81 at 42)). In addition to the cash and documents, police also seized eleven cellular telephones. (DEA Report 3–4 (Dkt. No.

40-3 at 109–110)). Plaintiff, who had in fact earned the $5700 as a maid at a local hotel, was unable to

secure the return of her cash for more than six months, and then only after securing a judicial order

from United States District Judge James L. Robart. (Order, Robart, J. (Dkt. No. 40-3 at 134–35)).

The parties dispute whether officers seized other property belonging to Plaintiff. Specifically,

Plaintiff claims that officers seized approximately three troy ounces of gold jewelry that she kept in the

same suitcase. (Jama Decl. 3 (Dkt. No. 43)). There is no mention of gold jewelry in the DEA report of

investigation (Dkt. No. 81 at 22–28), and Detective Corrigan expressly disavows having encountered

or seized gold jewelry. (Corrigan Memo (Dkt. No. 81 at 42)). Both the DEA and the Tukwila Police

Department claim that they never seized gold jewelry, and have therefore refused Plaintiff's continued

requests for its return. (*See* Motion (Dkt. No. 40-3 at 137–39)). Plaintiff submits photographs of herself

wearing the jewelry (Photos (Dkt. No. 40-3 at 144–46)), and states that it was in her suitcase before the

search occurred, and that it was gone immediately afterward. (Jama Decl. 3 (Dkt. No. 43)).

## A.   Procedural Background

This is not the first time this case has come before the Court. On March 2, 2010, the Court

granted the motion to dismiss of Defendants Robert Brooks, Michele Hackett and Jennine Smith.

Plaintiff alleged, *inter alia*, that the officers had violated her rights under the Religious Freedom

Restoration Act when they refused her requests for a headscarf and clothing that was more modest than

the nightgown she was wearing. The Court concluded that Defendants Hackett and Smith were entitled to

qualified immunity because whatever statutory or constitutional right to modest clothing Plaintiff might

have enjoyed was not clearly established at the time of the search. (*See* Order 12–16 (Dkt. No. 82)).

As the matter now comes before the Court, Defendant City of Seattle and the four named SWAT

team officers have moved for summary judgment on all claims. (Motion (Dkt. No. 91)). Plaintiff has filed

her own cross-motion for partial summary judgment on many of these same claims. (Cross-Motion (Dkt.

No. 96)). Plaintiff alleges that the officers violated her Fourth Amendment rights when they searched her apartment, devoting considerable attention to the manner in which officers announced their presence, and how they breached her door and entered her apartment without waiting for her to provide them entry. Plaintiff further alleges that the Seattle SWAT team members used excessive force when they detained her. (Second Am. Compl. 13–14 (Dkt. No. 61)). Plaintiff argues that both of these violations were caused by a policy or custom of the City of Seattle. (*Id.* 14).

Defendant United States Government also moves for summary judgment on all claims. (Motion (Dkt. No. 86)). Plaintiff has alleged that the United States Government was negligent in retaining the Seattle SWAT team to perform the search, and has further alleged the United States Government is liable for the tort of outrage because its agents refused Plaintiff's requests to cover herself more modestly. (Second Am. Compl. 14 (Dkt. No. 61)). Finally, Defendant City of Tukwila has also moved for summary judgment on all claims. (Motion (Dkt. No. 77)). Plaintiff alleges that the City of Tukwila is liable for the conversion or negligent bailment of her gold jewelry.[5] (Second Am. Compl. 14 (Dkt. No. 61)).

## II.   LEGAL STANDARD

This Court renders summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The Supreme Court explained the relationship between the substantive law and the summary-judgment standard in *Anderson v. Liberty Lobby*: "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will

---

[5]In the second amended complaint, Plaintiff also alleges that Tukwila police officers violated her First Amendment rights and her rights under the Religious Freedom Restoration Act when they refused her requests for clothing that was more modest than the nightgown she was wearing when detained. Plaintiff has since withdrawn those claims. (Pl. Resp. 9–10 (Dkt. No. 80)).

not defeat an otherwise properly supported motion for summary judgment; the requirement is that there

be no *genuine* issue of *material* fact." *Liberty Lobby*, 477 U.S. 242, 247–48 (1986) (emphases in

original). The Court continued: "As to materiality, the substantive law will determine which facts are

material. Only disputes over facts that might affect the outcome of the suit under the governing law

will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or

unnecessary will not be counted." *Id.* at 248.

In deciding whether to grant a motion for summary judgment, this Court views all facts in the

light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-

moving party. *See id.* at 255 ("Credibility determinations, the weighing of evidence, and the drawing of

legitimate inferences from the facts are jury functions, not those of a judge[.] . . . The evidence of the

non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."). That does

not mean that this Court accepts conclusory allegations in a complaint as averments of specific facts.

*See Lujan v. National Wildlife Federation*, 497 U.S. 871, 888–89 (1990). The standard instead requires

that a party confronted with a properly supported motion for summary judgment "designate specific

facts showing there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. As the Supreme Court has

stated: "When the moving party has carried its burden under Rule 56(c), its opponent must do more

than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric

Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

## III.   FOURTH AMENDMENT CLAIMS

Plaintiff alleges that the four named officers, the City of Seattle, and the United States

Government violated her Fourth Amendment rights. Her claims against the City of Seattle and the

United States Government are derivative of her claims against the named officers. Plaintiff argues that

the United States Government is liable because it negligently hired the Seattle SWAT team members to

perform the raid, and she argues that the City of Seattle is liable because SWAT team members were acting pursuant to city policy when they violated her rights.

The Court addresses Plaintiff's claims against the four named officers first. Because those claims fail, Plaintiff's Fourth Amendment claims against the City of Seattle and the United States Government necessarily fail.

### A.    Knock-and-Announce Principle

The Fourth Amendment of the U.S. Constitution protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. The reasonableness requirement extends to the *manner* in which police execute otherwise valid searches, and generally requires that they knock, announce their presence, and wait for the occupant of a home to open the door. *See, e.g., United States v. Banks*, 540 U.S. 31, 35 (2003). This knock-and-announce requirement has ancient roots in the common-law principle that "every man's house is looked upon by the law to be his castle of defense and asylum, wherein he should suffer no violence." 3 WILLIAM BLACKSTONE, COMMENTARIES 288 (1763). Even at common law, however, the knock-and-announce requirement was not an inflexible command. *See Ker v. California*, 374 U.S. 23, 38 (1963) (plurality opinion) ("It has been recognized from the early common law that such breaking is permissible in executing an arrest under certain circumstances."). The same is true today under the Fourth Amendment: The knock-and-announce requirement gives way under a variety of exigent circumstances, including risk of violent confrontation, risk of flight, and potential destruction of evidence. *See Banks*, 540 U.S. at 36.

On this legal issue, the Supreme Court has spoken with a remarkably unanimous voice. In 1995, the Court first constitutionalized the common-law principle that police must generally knock, announce their presence and wait for an occupant to open the door before entering a home. The Court did so

unanimously in *Wilson v. Arkansas*, 514 U.S. 927, 930 (1995). Since then, the Court has decided three

knock-and-announce cases, and has reached a unanimous holding in all three.[6] In *Richards v. Wisconsin*,

the Court held that the Fourth Amendment forbids a blanket exception to the knock-and-announce

requirement in all felony drug investigations. *Richards*, 520 U.S. 385 (1997) ("[T]he fact that felony

drug investigations frequently present circumstances warranting a no-knock entry cannot remove from

the neutral scrutiny of a reviewing court the reasonableness of the police decision not to knock and

announce in a particular case."). In *United States v. Ramirez*, the Court held that the same standard

applies to no-knock entries regardless of whether police incidentally destroy property upon entry.

*Ramirez*, 523 U.S. 65 (1998). Finally, in *United States v. Banks*, the Court held that police behaved

reasonably when they breached a door after giving a suspect fifteen to twenty seconds to answer. *Banks*,

540 U.S. 31 (2003).[7]

     Three clear principles have emerged from the four cases. First, the Fourth Amendment allows

police officers to forego the knock-and-announce requirement upon a showing of reasonable suspicion.

The Court described the requirement in *Richards*: "In order to justify a no-knock entry, the police must

have a reasonable suspicion that knocking and announcing their presence, under the particular

circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the

crime by, for example, allowing the destruction of evidence." 520 U.S. at 394. The Court took pains to

---

[6]The Court also issued a sharply divided opinion in *Hudson v. Michigan*, a case dealing with the knock-and-announce principle. *Hudson*, 547 U.S. 586 (2006). The issue before the Court was *not* the reasonableness of the police officers' entry, however. The only issue before the Court was whether the exclusionary rule applies when police unreasonably fail to knock and announce their presence before entering a dwelling. *See id.* at 590 ("From the trial level onward, Michigan has conceded that the entry was a knock-and-announce violation. *The issue here is remedy.*") (emphasis added).
    On the issue of remedy, the Court divided 5-4.

[7]The cases have presented two different factual scenarios: cases where police decide to forego knocking and announcing their presence altogether, *e.g.*, *Ramirez*, 523 U.S. at 68–69, and cases where police knock and announce their presence, and then breach the door after waiting a certain amount of time. *E.g.*, *Banks*, 540 U.S. at 35. The Supreme Court has stated that the same criteria bear on the reasonableness inquiry in both types of cases, *see Banks*, 540 U.S. at 35, and Ninth Circuit courts apply the same analysis to each. *United States v. Coombs*, 394 F.3d 739, 742 n.2 (9th Cir. 2005).

distinguish the reasonable-suspicion standard from the higher probable-cause standard: "This showing [of reasonable suspicion] is not high, but the police should be required to make it whenever the reasonableness of a no-knock entry is challenged." *Id.* at 394.

Second, the Court has consistently conducted its legal analysis from the perspective of the objectively reasonable officer. As the Court stated in *Ramirez*, "[A] no-knock entry is justified *if police have reasonable suspicion* that knocking and announcing would be dangerous, futile, or destructive to the purposes of the investigation." 523 U.S. at 71 (emphasis added). *Accord, e.g., Richards*, 520 U.S. at 395 ("[T]he reasonableness of the officers' decision . . . must be evaluated as of the time they entered the motel room.").

Third, the reasonableness inquiry requires that a court consider the totality of the circumstances; bright-line rules are inappropriate. As the Supreme Court stated in *Banks,* its most recent case dealing with the knock-and-announce principle, "[R]easonableness [is] a function of the facts of cases so various that no template is likely to produce sounder results than examining the totality of circumstances in a given case; it is too hard to invent categories without giving short shrift to details that turn out to be important in a given instance, and without inflating marginal ones." *Banks*, 540 U.S. at 36. In so stating, the Court was merely emphasizing what it had said in *Wilson*, the first constitutional knock-and-announce case. In *Wilson*, the Court ended its opinion by "leav[ing] to the lower courts the task of determining the circumstances under which an unannounced entry is reasonable under the Fourth Amendment." 514 U.S. at 936.

In a series of cases, the Ninth Circuit has set itself to the task.[8] *United States v. Peterson* is

---

[8]*See, e.g., Howell v. Polk*, 532 F.3d 1025 (9th Cir. 2008); *United States v. Combs*, 394 F.3d 379 (9th Cir. 2005); *United States v. Peterson*, 353 F.3d 1045 (9th Cir. 2003); *United States v. Granville*, 222 F.3d 1214 (9th Cir. 2000); *United States v. Hudson*, 100 F.3d 1409 (9th Cir. 1996).

especially instructive. *Peterson*, 353 F.3d 1045 (9th Cir. 2003). The case was decided in late 2003, which means that the Ninth Circuit had the benefit of all four Supreme Court cases discussed above.[9] Members of a SWAT team were preparing to knock on the door of a suspected counterfeiter and bombmaker, when a roommate suddenly opened the front door and saw them. The roommate, who recognized the men as police officers, tried to re-enter the home and to close the door behind him. SWAT team members did not allow him to succeed, loudly announcing, "Police with a search warrant," while forcing the door open. *Id.* at 1047. The Ninth Circuit affirmed the trial court's conclusion that the no-knock entry was reasonable, concluding that the SWAT team had been confronted with "futility, potential destruction of evidence, and danger." *Id.* at 1049. Knocking and announcing would have been futile, the Ninth Circuit stated, because the occupants already knew that police were outside. *Id.* ("Just as one cannot close a door that is already closed, one cannot 'announce' a presence that is already known."). Police faced the exigency of danger because the defendant could have injured officers by detonating explosive devices, the Ninth Circuit concluded. Police also faced the exigency of potential evidence destruction, the court continued, because the defendant could have disposed of methamphetamine that he was known to maintain at the residence. *Id.* at 1049–50.

On the other end of the Ninth Circuit's reasonableness spectrum in knock-and-announce cases lies *United States v. Granville*, 222 F.3d 1214 (9th Cir. 2000). Police arrived at the home of a suspected drug trafficker's apartment at 7 a.m. to execute a search warrant. The lead officer knocked loudly three times, and announced, "Oakland police officer, search warrant, open the door." *Id.* at 1217. Police waited

---

[9]Two of the four Supreme Court cases discussed above were reversals of Ninth Circuit opinions. In *United States v. Banks*, the Ninth Circuit held that the fifteen-to-twenty-second wait time was unreasonably short. It had also defined four categories of knock-and-announce cases, and fashioned a non-exclusive list of eight factors that an officer should consider in evaluating the reasonableness of an entry. *See United States v. Banks*, 282 F.3d 699, 704 (9th Cir. 2002). The Supreme Court reversed, rejecting the appellate court's categorical and factor-rich approach in favor of a totality-of-the-circumstances analysis. *Banks*, 540 U.S. 31, 35–36 (2003). The second Ninth Circuit knock-and-announce case reversed by the Supreme Court was *United States v. Ramirez*, where the Ninth Circuit found that police acted unreasonably in destroying the defendant's property when executing the search warrant. *See United States v. Ramirez*, 91 F.3d 1297, 1300–01 (9th Cir. 1996). The Supreme Court reversed. *Ramirez*, 523 U.S. 65 (1998).

five seconds. Hearing no response from inside, they breached the door. The Ninth Circuit concluded that the entry was unreasonable as a matter of Fourth Amendment law. *Id.* at 1218–19. The court agreed with the officers that police can sometimes legitimately infer refusal to provide entry from a suspect's silence, *id.* at 1218, but stated that police must generally wait "a significant amount of time" before forcibly entering. The Ninth Circuit concluded: "Under the facts of this case, five seconds cannot be considered a 'significant amount of time.'" *Id.* at 1218. This was especially true, the court found, because the warrant was executed in the early-morning hours, "when it was likely that the occupants . . . would be asleep[,]" and because police had failed to demonstrate reasonable suspicion of any exigency whatsoever. *See id.*

### i.    Discussion

Mr. Jama's 5:42 a.m. arrival at Plaintiff's apartment is a highly material fact. So too are the facts that police were executing search warrants for seventeen different locations simultaneously, and that the alleged co-conspirators made extensive use of cellular telephones. Together, these facts cast a long shadow, touching upon almost all the mixed questions of law and fact that this case presents. When conducting its legal analysis, the Court considers these facts from the perspective of the reasonable officer. *See Ramirez*, 523 U.S. at 71.

The reasonable officer considers Mr. Jama's early-morning arrival unusual: Some people might leave for work as early as 5:42 a.m., but very few people pay social calls or arrive home at that hour. From the moment that Mr. Jama enters the apartment, the reasonable officer is asking himself, "Why is he here? What is he doing inside?" The reasonable officer is also wondering whether Mr. Jama might have learned about the east-coast searches that had occurred two and one-half hours earlier. Twenty minutes after Mr. Jama's arrival—standing outside the front door in full SWAT gear, waiting for the moment that Sergeant Allen will knock on the door and initiate the search—the reasonable officer is *still* wondering about Mr. Jama's purpose inside the apartment.

Mr. Jama's arrival has also brought some certainty to the mind of the reasonable officer, however: The reasonable officer *knows* that there is at least one person inside the apartment, and he *knows* that the person is awake.[10] The reasonable officer weighs these questions and inferences that arise from Mr. Jama's arrival against the background circumstances of the situation before him. To the reasonable officer, it is highly material that police are executing seventeen search warrants simultaneously—all of them against alleged co-conspirators who knew each other and made extensive use of cellular telephones. Mr. Jama might be informing other search targets using cellular telephone calls while police are waiting for six o'clock to arrive.

Officers were therefore expecting to get some answers once they announced their presence. The man who had walked inside twenty minutes earlier would either cooperate or he would not. When Sergeant Allen knocked loudly on the door and shouted, "Seattle police with a warrant! Open the door," what did officers hear from inside the apartment? Nothing. For eight to ten full seconds—nothing. No movement toward the door. No voice yelling out, "Be right there." Nothing. At some point, SWAT team members were entitled to conclude that it would be futile to wait any longer. When exactly that point arrives is a function of the totality of the circumstances. In this case, police were searching for a contraband substance. The possibility existed that apartment occupants would destroy evidence by, perhaps, flushing *khat* down the toilet. Police also knew that members of the distribution network made extensive use of cellular telephones, meaning that the occupants inside could notify co-conspirators at

---

[10]Officers may or may not have learned that two occupants had seen them from an upstairs window. Agent Hackett states that she alerted SWAT team members over the radio that Mr. Jama and Plaintiff had seen them in the moments before the raid, but Sergeant Allen states that the team breached the door on his own eight-to-ten-second count. *Compare* (Hackett Dep. 36–37 (Dkt. No. 93-2 at 16–17)) *with* (Allen Dep. 84 (Dkt. No. 97-2 at 58)).

The Court need not resolve this factual dispute. Under the uncontested facts, officers were reasonable to enter after giving the occupants eight to ten seconds to answer the door. It is therefore immaterial whether Agent Hackett's radio alert provided them with an additional justification to breach the door. *See Liberty Lobby*, 477 U.S. at 248 ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.").

any of the other sixteen locations of the search. Under these circumstances, a reasonable officer outside Plaintiff's apartment would worry that further waiting could lead to injury to officers or to possible evidence destruction, not only at Plaintiff's apartment, *but at one of the other sixteen locations, as well.*

Most important of all, police knew that someone was inside and awake, and they knew that the person had failed to respond to their announcement. Under the circumstances of this case, the reasonable officer was entitled to conclude that further waiting, "while the occupants considered whether to admit or resist them," would amount to "a meaningless act." *See Peterson*, 353 F.3d at 1049.

Ninth Circuit precedent points to the same outcome. This case is much more analogous to *Peterson* than it is to *Granville.* As in *Peterson*, police were certain that an occupant of the apartment knew they were outside, and that they had arrived with the intention of executing a search warrant. In *Peterson*, the roommate knew that the officers were outside. *Peterson*, 353 F.3d at 1047. In this case, the early-morning visitor was awake and knew that the officers were outside at the door. As in *Peterson*, therefore, there came a point where it was futile to ask officers to wait longer. In *Peterson*, that moment arose the moment they were spotted by the roommate. In this case, it arose after officers had given the occupants a chance to respond, and the occupants had chosen to remain silent. Also as in *Peterson*, police were entitled to reasonably suspect that occupants were destroying perishable evidence with each passing moment that no one appeared to provide them entry. *See Peterson*, 353 F.3d at 1050 ("Once the occupants knew police were outside, the suspected presence of drugs—*the quintessential disposable contraband*—provided yet another justification for the no-knock entry.") (emphasis added).

This case is easily distinguishable from *Granville*, in which no exigency whatsoever existed. *Granville*, 222 F.3d at 1219. In *Granville*, police arrived in the early-morning hours, but had no reason to think that anyone inside the apartment was stirring. They knocked and waited only five seconds before breaching the door. 222 F.3d at 1217. In this case, police also arrived in the early-morning hours, but *knew*

that at least one of the apartment's occupants was awake. Under the facts of this case, therefore, eight to ten seconds represented a "significant amount of time" during which officers were able to infer "a refusal to comply with an officer's order to 'open up' . . . from silence." *See Granville*, 222 F.3d at 1218.

Plaintiff's arguments to the contrary distort the material facts and misstate the law. For example, Plaintiff argues that because of the early-morning hour, "the occupants . . . were reasonably expected to be in bed." (Pl. Resp. 14 (Dkt. No. 108)). Not true. Officers had observed Mr. Jama arrive at Plaintiff's apartment only twenty minutes before the search. They knew that at least one of the apartment's occupants was awake. Plaintiff also argues that it is "immaterial" that police officers were performing "simultaneous multi-location warrant service." (Cross-Motion 12 (Dkt. No. 96)). To the contrary—it is highly material. Because the distribution ring made extensive use of cellular phones, police had reason to suspect that occupants were notifying other members of the ring about the coordinated raids. To suggest, therefore, that the coordinated nature of the raids is "immaterial" is to ignore the "totality-of-the-circumstances analysis" that the Fourth Amendment's reasonableness inquiry requires. *See Banks*, 540 U.S. at 36. Finally, Plaintiff argues that there was no potential for destruction of evidence because *khat* is "a leafy substance analogous to marijuana that is not easily destroyed." (Pl. Resp. 14 (Dkt. No. 108)). This is hardly determinative: The landmark 1995 knock-and-announce case, which constitutionalized the principle for the first time, involved a suspect who was apprehended while flushing marijuana down his toilet. *See Wilson*, 514 U.S. at 93.

For the aforementioned reasons, the Court hereby dismisses Plaintiff's Fourth Amendment unreasonable-entry claim against Defendants Todd Harris, Matt Ness, Joe Pioli, and Steve Wilske.

## B.    Excessive Force

Officers searching a home for contraband pursuant to a judicially authorized search warrant have the categorical authority to detain the occupants of the premises while a proper search is conducted.

*Michigan v. Summers*, 452 U.S. 692, 705 (1981). In doing so, officers must use reasonable force. *Muehler v. Mena*, 544 U.S. 93, 99–100 (2005). Reasonable force can include handcuffing. *Id.* at 100. In determining whether a government official's use of force was reasonable, this Court must "balance the nature and quality of the intrusion of the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989).

In *Mena*, the Supreme Court applied these principles to a factual scenario similar to this one. Police officers searched the apartment of Iris Mena for weapons. Ms. Mena was not herself suspected of illegally owning firearms. Police executed the warrant in the early-morning hours, and discovered four occupants on the property. Police "took those individuals and Mena into a converted garage, . . . [and] while the search proceeded, one or two officers guarded the detainees, who were allowed to move around the garage *but remained in handcuffs.*" *Mena*, 544 U.S. at 96 (emphasis added).

### i.   Discussion

Plaintiff's claim of excessive force fails. Having breached Plaintiff's door and detained all the occupants, officers were reasonable in "exercis[ing] unquestioned command of the situation." *Summers*, 452 U.S. at 703. They therefore handcuffed all the apartment's occupants and detained them in a single location, while they searched the apartment. Moreover, they summoned medics when Plaintiff complained of pain in her shoulder. Medics examined Plaintiff, but determined that she did not need treatment. (Jama Decl. 2 (Dkt. No. 43)). Officers were reasonable in maintaining total control of the situation while conducting the search, just as they were reasonable in breaching the door after eight to ten seconds.[11]

For the aforementioned reasons, the Court hereby dismisses Plaintiff's remaining Fourth Amendment claims against Defendants Todd Harris, Matt Ness, Joe Pioli, and Steve Wilske.

---

[11]To the degree that Plaintiff alleges she was made to remain handcuffed for an unreasonably long time, (*See, e.g.,* Pl. Resp. 20 (Dkt. No. 108) ("Plaintiff was forced to sit . . . for as many as five hours outdoors, with her hands lashed behind her back[.]")), she has failed to name the correct defendants. Under the undisputed facts, Seattle SWAT team members left Plaintiff's apartment at 6:15 a.m. (Allen Decl. 5 (Dkt. No. 92)).

1

### C.    Municipal & Federal Liability

2

Plaintiff argues that Defendant City of Seattle is vicariously liable for the unconstitutional acts of

3

the four officers because those acts were attributable to city policy or custom. (Second Am. Compl. 13

4

(Dkt. No. 61)). Plaintiff argues that the United States Government is also liable for their acts, because

5

the Government was negligent in retaining and supervising the four officers.

6

The Article III standing requirement applies to all claims, against all defendants. A plaintiff has

7

standing if she demonstrates (1) injury in fact, whether actual or imminent; (2) which was caused by the

8

defendant's conduct; and (3) which will be redressed by a favorable decision. *See Lujan v. Defenders of*

9

*Wildlife*, 504 U.S. 555, 560 (1992). Because the Court has concluded that the four named officers

10

inflicted no constitutional "injury in fact" upon Plaintiff, it necessarily concludes that Plaintiff lacks

11

standing to proceed against the officers' principals: Defendant City of Seattle and Defendant United

12

States Government.

13

14

For this reason, Plaintiff's negligent-hiring claim against the United States Government is hereby

15

dismissed. Plaintiff's Fourth Amendment claims against the City of Seattle are dismissed for the same

16

reason.

17

## IV.    REMAINING CLAIMS

18

Three issues remain: First, Plaintiff alleges that the United States Government is liable for the

19

common-law tort of outrage under the Federal Tort Claims Act because federal agents forced her to

20

appear in a relative state of undress before unrelated males, refusing her continued requests for modest

21

clothing and a head scarf. (Second Am. Compl. 14 (Dkt. No. 61)). Second, Plaintiff alleges that the City

22

of Tukwila is liable for the conversion or negligent bailment of her gold jewelry. (*Id.* 14). Finally, there

23

remains Plaintiff's motion for reconsideration. (Dkt. No. 84). The Court addresses each issue in turn.

24

25

//

26

ORDER, C09-0256-JCC
Page 20

1

### A.    Outrage

2      Plaintiff has filed a claim for outrage against one defendant: the United States Government.

3  Plaintiff's outrage claim reads, in its entirety: "By virtue of the above-described actions of agents of the

4  United States, the United States is liable for the tort of outrage because of the extreme and outrageous

5  conduct of [Officers Smith and Hackett] and the officers under their supervision, intentionally or

6  recklessly inflicting severe emotional distress on Plaintiff." (Second Am. Compl. 14 (Dkt. No. 61)).

7  Plaintiff argues that the United States Government is liable for the actions of its agents under the Federal

8  Tort Claims Act. (*Id.* 14).

9      To state a claim for outrage under the common law of Washington State, a plaintiff must show

10 "(1) extreme and outrageous conduct; (2) intentional or reckless infliction of emotional distress; and (3)

11 actual result to the plaintiff of severe emotional distress." *Birklid v. Boeing Co.*, 904 P.2d 278, 286

12 (Wash. 1995). The State Supreme Court has emphasized that the first two elements pose a high bar to

13 relief:

14

15         First, the emotional distress must be inflicted intentionally or recklessly; mere negligence
          is not enough. Second, the conduct of the defendant must be outrageous and extreme. . . .
16         [I]t is not enough that a defendant has acted with an intent which is tortious or even
          criminal, or that he has intended to inflict emotional distress, or even that his conduct has
17         been characterized by 'malice,' or a degree of aggravation which would entitle the
          plaintiff to punitive damages for another tort. Liability exists only where the conduct has
18         been so outrageous in character, and so extreme in degree, as to go beyond all possible
          bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized
19         community.

20

21 *Id.* at 287 (internal markings omitted).

22      Whether a defendant's conduct is so egregious that it constitutes the tort of outrage is normally a

23 jury question. At the summary-judgment stage, the trial court's function is "to determine if reasonable

24 minds could differ about whether the conduct was so extreme as to result in liability." *Seaman v. Karr*,

25

26 ORDER, C09-0256-JCC
   Page 21

59 P.3d 701, 710 (Wash. Ct. App. 2002). In determining whether the case should go to the jury, a trial

court considers: "(a) the position the defendants occupied; (b) whether the plaintiff was particularly

susceptible to emotional distress, and if the defendants knew this fact; (c) whether the defendants'

conduct may have been privileged under the circumstances; (d) whether the degree of emotional distress

caused was severe as opposed to merely annoying, inconvenient, or embarrassing to a degree normally

occurring in a confrontation between the parties; and (e) whether the defendants were aware that there

was a high probability that their conduct would cause severe emotional distress, and they consciously

disregarded it." *Id.*

Two Washington State cases are especially instructive. In *Seaman v. Karr*, the Washington State

Court of Appeals reversed the trial court's dismissal of a plaintiff's outrage claim against police officers.

*Seaman*, 59 P.3d 701 (Wash. Ct. App. 2002). Police were investigating a 1999 gang-related shooting. Their

chief suspect listed his address as 3511 South Orchard, Apartment C-7, and police secured a search warrant

for that location. Unfortunately, the suspect moved out of the apartment approximatley one month before

police officers secured the warrant. The plaintiffs, who had no connection to the shooting whatsoever, had

moved in shortly after the suspect left. On the morning of May 18, 1999, members of the Tacoma City

Police Department's SWAT team raided Apartment C-7 using tactics similar to those employed in this case.

When they entered the apartment, instead of finding the suspects, police found the plaintiffs: "a terrified

elderly white male [and] a middle-aged Filipino female." *Id.* at 704. Over the course of the next few hours,

the plaintiffs insisted to police that they had made a mistake. Mrs. Seaman told police that her husband

suffered from a heart condition and other medical problems, but police refused to modify their harsh

detention techniques. Police "pulled Mr. Seaman up hard off the ground by his handcuffed wrists, causing

him to scream in pain[,]" and "moved [him], still in handcuffs, crying and shaking uncontrollably, to a

chair." *Id.* at 705. The appellate court concluded that the plaintiffs had successfully pled and supported a

claim for outrage. For the court, it was especially important that the plaintiffs had notified the police of Mr. Seaman's health conditions. As the court stated, "The defendants consciously disregarded an obvious, high probability that their conduct would cause the Seamans to suffer severe emotional distress. . . . Mrs. Seaman repeatedly tried to explain to the defendants about [Mr. Seaman's] medical condition and asked for help, which the Seamans claim the defendants rebuffed." *Id.* at 710–11.

The second instructive case is *Robel v. Roundup Corp.*, 59 P.3d 611 (2002). An employee sued her employer for outrage after other employees ridiculed her disability status and called her a "bitch" and a "cunt" while she was at work. *Robel*, 59 P.3d at 614. The State Supreme Court held that the employer could be held vicariously liable for the actions of its employees. The court stated, "The proper inquiry is whether the employee was fulfilling his or her job functions at the time he or she engaged in the injurious conduct." *Id.* at 621. Applying the rule to the facts of the case, the court found that the employer was liable because "workers tormented Robel on company property during working hours, as they interacted with co-workers and performed the duties they were hired to perform." *Id.* The court continued; "Nothing in the record suggests that the abusive employees left their job stations or neglected their assigned duties to launch the verbal attacks on Robel." *Id.*

### i.      Federal Tort Claims Act

Under the terms of the Federal Tort Claims Act, *codified at* 28 U.S.C. §§ 1346(b), 2671–80, the Government is potentially liable "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, *under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.*" 28 U.S.C. § 1346(b)(1).

//

ii.    **Discussion**

Plaintiff has properly pled and supported a claim for outrage. Taking the facts in the light most favorable to Plaintiff, a rational jury could find that federal officials, who enjoyed a position of power over Plaintiff while conducting the search in this case, forced her to appear in a state of relative undress before unrelated men for a significant period of time. They forced her to appear in this state of undress even though she had modest clothing in the very apartment that officers were searching. A rational jury could find that police officers therefore unnecessarily degraded Plaintiff, and that this behavior ought "to be regarded as atrocious, and utterly intolerable in a civilized community." *See Birklid*, 904 P.2d at 287.

A rational jury could also find that federal agents knew full well that Plaintiff's Muslim faith made her particularly susceptible to emotional distress under these circumstances. *See Seaman*, 59 P.3d at 701 (stating that a trial court should consider, *inter alia*, "the position the defendants occupied[,]" and "whether the plaintiff was particularly susceptible to emotional distress, and whether the defendants knew of this fact"). Plaintiff continuously requested modest clothing and explained that her requests were the result of sincerely held religious beliefs. Federal officials nonetheless "consciously disregarded" the effect that their refusal was likely to have on Plaintiff. *See id.* Whether such behavior is sufficiently "outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency" is a question for the jury. *See Birklid*, 904 P.2d at 287.

Because Washington State law holds employers liable if their agents commit the tort of outrage while acting in the scope of their employment, Plaintiff has successfully pled and supported a claim under the Federal Tort Claims Act against the United States Government. The conduct of which Plaintiff complains occurred while federal officials were searching her apartment. There is no indication that officers left the job site or neglected job functions while forcing Plaintiff to appear in a state of relative undress

before unrelated males. *See Robel*, 59 P.3d at 621. In fact, they were performing their job functions of detaining apartment occupants when they consistently refused Plaintiff's requests for covering.

For the aforementioned reasons, the motion for summary judgment of the United States Government is hereby denied.

### B.   Conversion and Negligent Bailment

At common law in Washington State, "conversion is the act of wilfully interfering with any chattel, without lawful justification, whereby any person entitled thereto is deprived of the possession of it." *Judkins v. Sandler-MacNeil*, 376 P.2d 837, 838 (Wash. 1962). A plaintiff does *not* bear the burden of proving that a defendant intentionally interfered with the chattel. *Id.* ("Proof of the defendants' knowledge or intent are not essential in establishing a conversion.").

To state a claim for negligence at common law in Washington State, a plaintiff show that (1) a defendant owed her a duty; (2) the defendant breached the duty; and (3) the breach directly and proximately caused (4) her injury. *Sheikh v. Choe*, 128 P.3d 574, 577 (Wash. 2006). When police officers seize a person's property pursuant to a search, they become involuntary bailees of the seized property. *See State v. White*, 958 P.2d 982, 986 n.9 (Wash. 1998) (dictum). As such, they owe people a duty of slight care. *See id.*

Plaintiff argues that a Tukwila City police officer converted her jewelry by depriving her of it without lawful justification. In the alternative, she argues that an officer seized the jewelry with lawful justification, but failed to properly inventory it. Under this alternative theory, the City of Tukwila became an involuntary bailee, owing Plaintiff a duty of slight care with respect to her gold jewelry. Because the jewelry was not properly inventoried, Plaintiff argues, the City breached its duty to use even the slightest of care. (Pl. Resp.  7–9 (Dkt. No. 80)). At the summary-judgment stage, Plaintiff only needs to offer evidence tending to establish each element of her claim.

Plaintiff easily clears that hurdle. She has pled facts from which a jury could infer that a Tukwila City police officer took the gold jewelry without lawful justification. She has also pled facts from which a jury could infer that a Tukwila police officer seized her jewelry and failed to make a proper inventory. Under either scenario, the jury could find, the officer's actions have deprived Plaintiff of her jewelry, which is now lost. Tukwila City police officers claim that they never seized any jewelry. This is of no importance at the summary-judgment stage, as "[c]redibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge[.]" *Liberty Lobby*, 477 U.S. at 255. Plaintiff's negligent-bailment claim survives.

Defendant City of Tukwila offers three chief arguments to the contrary. First, the City argues that its officers owed no duty to Plaintiff. Second, the City argues that it cannot be held liable for the torts of its employees. Finally, the City argues that Plaintiff's second amended complaint fails to give them notice of a negligent-bailment claim. All three arguments fail. With respect to the City's first argument, it is axiomatic that a bailor's duty runs to the bailee. *See, e.g., American Tug Boat Co. v. Washington Toll Bridge Authority*, 291 P.2d 668, 671 (Wash. 1956) ("[I]t is the element of lawful possession, however created, *and duty to account for the thing as the property of another*, that creates the bailment." (emphasis added)). Defendant cites to cases that involve a general police duty to investigate crimes. (*See* Def. Mot. 4 (Dkt. No. 77)) (citing, *inter alia, Dever v. Fowler*, 816 P.2d 1237, 1242–43 (Wash. Ct. App. 1991) (holding that the police duty to investigate arson runs to the public generally, and not to any specific individual)). These cases are not on point. While the City of Tukwila's duty to investigate contraband crimes—including crimes involving *khat* importation and distribution— runs to the public generally, its duty to preserve bailed property runs to the owner of the property.

The City's second argument relies on the conclusion that conversion is an intentional tort. (*See* City Reply 6 (Dkt. No. 83)) ("It is well established that  an employer cannot be held liable in *respondeat*

*superior* for the intentional torts of its employees."). As the Court discussed above, conversion is not

necessarily an intentional tort. This argument therefore fails. Finally, with respect to the City's third

argument, federal pleading standards require that Plaintiff make only "a short and plain statement of the

claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). Plaintiff has met that

standard. Her second amended complaint includes allegations that specific items of jewelry were seized,

and that "[t]he jewelry has never been accounted for or returned to [her]." (Second Am. Compl. 10 (Dkt.

No. 61)). This satisfies the notice-pleading standard.

For the aforementioned reasons, the Court hereby denies the motion for summary judgment of

Defendant City of Tukwila.

## C.     Motion for Reconsideration

Plaintiff asks the Court to reconsider its March 2, 2010 order dismissing her claims under the

Religious Freedom Restoration Act. (Dkt. No. 84). Plaintiff argues that the Court failed to consider

whether Agents Hackett and Smith violated her Fourth Amendment rights when they detained her in an

unreasonable manner. Plaintiff is correct that the Court nowhere explicitly addressed her Fourth

Amendment claims against Defendants Hackett and Smith.

The Court does so now, and hereby dismisses the Fourth Amendment claims against Officers

Hackett and Smith. Plaintiff's Fourth Amendment claims against those defendants revolved around their

failure to allow her to more modestly clothe herself. (*See, e.g.,* Pl. Resp. 14–19 (Dkt. No. 45) (stating

that officers violated the Fourth Amendment by "refusing to allow [Plaintiff] to clothe herself properly

while she was detained[,]" and stating that the detention was unreasonable "due to unnecessary

indignity.")). The Court therefore dismisses Plaintiff's Fourth Amendment claims against Defendants

Hackett and Smith for the same reasons it dismissed her Religious Freedom Restoration Act claims

against the same defendants: Whatever Fourth Amendment right she may have enjoyed to modest

clothing was not clearly established at the time of the alleged deprivation. The officers are therefore entitled to qualified immunity. (*See* Order 12–16 (Dkt. No. 82)).

## V.   CONCLUSION

For the aforementioned reasons, the Court hereby GRANTS the motion for summary judgment of Defendant City of Seattle and Defendants Todd Harris, Matt Ness, Joe Pioli, and Steve Wilske. (Dkt. No. 91). The Court DENIES Plaintiff's cross-motion for summary judgment against the same defendants. (Dkt. No. 96).

The Court GRANTS in part and DENIES in part the motion for summary judgment of Defendant United States Government. (Dkt. No. 86). The Court DENIES the motion for summary judgment of Defendant City of Tukwila. (Dkt. No. 77).

Finally, the Court STRIKES Plaintiff's motion for reconsideration. (Dkt. No. 84).

SO ORDERED this 17th day of May, 2010.

JOHN C. COUGHENOUR
United States District Judge